IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:09-CR-73-1-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM IN SUPPORT OF |
| | ) | DEFENDANT'S PRO SE MOTION |
| PETERA MICALE CARLTON, | ) | FOR COMPASSIONATE RELEASE |
| | ) | |
| Defendant. | ) | |

Mr. Petera Micale Carlton, through undersigned counsel, respectfully moves this Honorable Court to grant his Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" presented by his immediate vulnerability to COVID-19 while detained with multiple extremely high-risk, chronic medical conditions. As verified herein and also attached to said Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), Mr. Carlton has properly exhausted his administrative remedies by filing his release request with the warden which was denied on August 21, 2020. *See* **Exhibit A**: Letter from Warden M.D. Smith.

Mr. Carlton is forty-five (45) years old and suffers from Type 2 diabetes mellitus with diabetic neuropathy. *See* **Exhibit B**: Mr. Carlton's Medical Records (2020). Diabetic neuropathy is a type of nerve damage from high blood sugar levels. Symptoms from diabetic neuropathy are painful and disabling, and also in Mr. Carlton's case, has led to amputations of his toes. *See* **Exhibit B**: Medical Records (2020).

1

While detained and unable to comply with reasonable social distancing and hygienic COVID-19 precautions recommended by the CDC, Mr. Carlton risks the most hazardous COVID-19 complications or death with his combination of diabetes, high blood pressure, and respiratory conditions. On a Bureau of Prisons Health Service clinical encounter on September 4, 2020, the medical provider noted the Mr. Carlton requires an inhaler for wheezing and "…sometimes at night [ ] will wake up gasping for air." *See* **Exhibit B**: Medical Records (2020).

Mr. Carlton's prescription medications include Insulin, Metformin, and Glipizide for diabetes; Bumetanide and Lisinopril for high blood pressure; Furosemide for hypertension; Potassium Chloride for mineral deficiency; Atorvastatin for high blood cholesterol; and Cholecalciferol for vitamin deficiency. *See* **Exhibit B**: Medical Records (2020).

Mr. Carlton has also had several severe foot ulcers secondary to diabetes mellitus which have required toe amputations. Mr. Carlton's callouses on his toes and toe amputations are treated by BOP medical providers who change the dressings when fluids are draining from the open wounds and who trim the callouses. Mr. Carlton has required the use of a wheelchair intermittently due to his amputations and foot ulcers. *See* **Exhibit B**: Medical Records (2020).

Mr. Carlton has expressed to Health Services clinicians on several occasions that, he cannot breathe even before ever testing positive for COVID-19. *See* **Exhibit B**, Medical Records (2020). During a May 14, 2020 encounter at the Health Services clinic, the registered nurse quoted Mr. Carlton's distress: "'[S]omething has to

2

happen, this breathing is getting worse. I just can't get my wind.'" *See* **Exhibit B**, at page 52. Mr. Carlton reported to Health Services providers that "he is waking up nightly gasping for breath and coughing up 'brown' fluid." *See* **Exhibit B**, at page 54. In one such medical note, the Health Services clinician wrote that Mr. Carlton had to catch him in the hallway of his unit to report debilitating shortness of breath again urgently. In another such note, the medical provider again recorded the severity of Mr. Carlton's condition: "The inmate states, 'I'm just real short of breath, Ms. Propst. Every time I climb the stairs, or if I get mad about something, it's like I can't breathe. I'm nervous, because a lot of people in my family [are having] heart attacks.'" *See* **Exhibit B**, at page 58. Nurses also noted that Mr. Carlton's fingernails even have hyperpigmented lines on them, which denotes malnutrition and vitamin deficiencies. *See* **Exhibit B**, at page 54.

Mr. Carlton is in custody at MCFP Springfield in Springfield, Missouri where the detained population is around 800 total inmates, according to the Federal Bureau of Prisons. Staff members and inmates have already been infected with COVID-19 at MCFP Springfield at higher rates than the general population. (*See* https://www.bop.gov/coronavirus/ wherein the public is provided a "snap shot" of one time, which clearly is subject to deteriorating conditions and an increasing hazard of airborne disease from moment to moment.)

According to a National Commission on COVID-19 and Criminal Justice report released September 2020 on the impact of COVID-19 in U.S. State and Federal Prisons, the COVID-19 mortality rate within prisons is twice as high as the general

population's morality rate and the rate of COVID-19 infections is over four times as high as the general population. *See* **Exhibit C***, Schnepel, Kevin T*. COVID-19 in U.S. State and Federal Prisons. Washington, D.C.: Council on Criminal Justice (September 2020). New outbreaks of COVID-19 have increased rapidly in recent months, which is particularly concerning when the United States has the largest incarcerated population in the world at about two million detainees. The mortality rate for Black Americans with COVID-19 is twice that of white Americans and Black Americans are incarcerated five times more often than white Americans. *See* **Exhibit C***, Schnepel, Kevin T*. COVID-19 in U.S. State and Federal Prisons. Washington, D.C.: Council on Criminal Justice (September 2020). A key finding from the report was that the highest COVID-19 mortality rates were observed "within large prisons and those within the Midwest region of the U.S." *Id.* Mr. Carlton is African American and detained at MCFP Springfield, which is a large prison in the Midwest region of the U.S. Therefore, considering all factors in this case, he is at the highest risk of COVID-19 mortality, presenting extraordinary and compelling reasons for compassionate release.

As most judges from the Eastern District of North Carolina have granted such Compassionate Release Requests where it is appropriate to show this type of legally-sanctioned mercy, it is respectfully requested that this Honorable Court also issue an order reducing Mr. Carlton's sentence to time served and/or home confinement given that it is appropriate to do so in Mr. Carlton's immediate case as well. For example,

4

*see United States v. Roberto Pablo Gutierrez*, Crim. No. 5:11-CR-149-1-BR, ECF No. 156 (E.D.N.C. April 30, 2020).

## STATEMENT OF FACTS

On June 18, 2009, Petera Carlton and Marcus Nelums were named in a four-count Indictment filed in the Eastern District of North Carolina. Count 1 charted both defendants with conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. Count 2 charged both with using and carrying a firearm in relation to a drug trafficking crime and aiding and abetting in violation of 18 U.S.C. §§ 924(c) and 2. Count 3 charged Carlton with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924. Count 4 charged Nelums with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924. PSR at ¶ 1-4. On December 14, 2009, Carlton pled guilty to Count 2, the government dismissed counts 1 and 3, and on April 8, 2010, a sentence of 288 months and 5 years of supervised release was imposed. His projected release date is February 2, 2031.

The current COVID-19 outbreak has not been contained in the United States and certainly and sadly not within our prison walls either. Thus, it is respectfully submitted that this Honorable Court find that he has satisfactorily pursued his administrative remedies given that all matters have been completed, as required by 18 U.S.C. § 3582(c)(1)(A). Accordingly, it is respectfully submitted that it is appropriate under these urgent circumstances for this Honorable Court not to strictly construe the administrative exhaustion requirement in the case sub judice and as

5

such, find that he has in fact exhausted his administrative remedies. *See Haines v. Kerner*, 404 U.S 519, 520 (1972).

## BACKGROUND

Congress first enacted 18 U.S.C. § 3582(c)(1) as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" for judges to assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983). "This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when 'extraordinary and compelling reasons' indicate that the sentence initially imposed on an individual no longer served legislative objectives." *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at * 5 (S.D.N.Y. Apr. 6, 2020).

The compassionate release statute empowered courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Congress delegated to the U.S. Sentencing Commission the responsibility of defining what were "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). It was not until 2007, more than two decades after the statute was enacted, that the Commission responded. It issued a

guideline stating that "extraordinary and compelling reasons" include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n.1(A)-(D).

Mr. Carlton is unfortunately extremely vulnerable to hospitalization and even death once he contracts COVID-19 in a matter of time. *See* Current CDC Determinations of High Risk Conditions: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed October 9, 2020). Due to the combination of extreme risk factors, proven through statistics and medical reports, Mr. Carlton's request for compassionate release qualifies under the guidelines as 'extraordinary and compelling' reasons. Application Note 1(A)(ii) to Guidelines Section 1B1.13 states extraordinary and compelling reasons, which include when the defendant is—

(I)     suffering from a serious physical or medical condition;
(II)    suffering from a serious functional or cognitive impairment; or
(III)   experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 app. n. 1(A)(ii). Application Note 1(B) identifies extraordinary and compelling reasons to include Mr. Carlton's "suffering from a serious physical or medical condition." Furthermore, Application Note 1(D) created a catch-all provision, for when the Director of the BOP determined "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."

As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the BOP, who adopted a program statement governing compassionate release that in many ways narrowed the criteria established by the Commission. *See* BOP Program Statement 5050.49. During the span of more than three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria. The Office of the Inspector General for the Department of Justice concluded in 2013 that "[t]he BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013), at 11, available at https://oig.justice.gov/reports/2013/e1306.pdf; *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015), at 51, available at https://oig.justice.gov/ reports/2015/e1505.pdf ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population…", decades of denying such Compassionate Release Reduction Requests are imprinted in its long standing history); U.S.S.G. § 1B1.13, app. n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates). Heeding this criticism, Congress acted.

The title of Section 603(b) of the First Step Act—"Increasing the Use and Transparency of Compassionate Release"—leaves no doubt as to Congress' intent in

modifying 18 U.S.C. § 3582(c)(1)(A). Through the First Step Act, enacted December 21, 2018, Congress sought to resuscitate compassionate release by, *inter alia*, allowing defendants to directly petition courts for relief, rather than leaving that power solely in the hands of the BOP. *See* 18 U.S.C. § 3582(c)(1)(A). "[U]nder the amended statute, a court may conduct such a review also 'upon motion of the defendant,' if the defendant has exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days has lapsed 'from the receipt of such a request by the warden of the defendant's facility,' whichever is earlier." *United States v. Decator*, No. CCB-95-0202, 2020 WL 1676219 (D. Md. Apr. 6, 2020) (*quoting* 18 U.S.C. § 3582(c)(1)(A)(i); Pub. L. 115-391, Title VI, § 603(b), Dec. 21, 2018, 132 Stat. 5239), *appealed by the government*. In other words, "a prisoner must exhaust the administrative appeal process, or wait 30 days, before his claim may be considered" by the court. *United States v. Underwood*, No. TDC-18-0201, 2020 WL 1820092, at *2 (D. Md. Apr. 10, 2020) (citing cases).

## ARGUMENT

Medical professionals within our country and around the world for that matter have deemed Mr. Carlton's vulnerability to COVID-19 as being placed in the high-risk category of likely not being able to survive the Coronavirus due to his history of chronic medical problems. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Mr. Carlton's underlying medical conditions make him especially vulnerable to COVID-19, constituting "extraordinary

9

and compelling reasons" for relief. His release does not pose a danger to the community, and a balancing of the § 3553(a) factors with the risks to Mr. Carlton posed by COVID-19 warrants relief.

**A. This Honorable Court has the authority to determine that Mr. Carlton's vulnerability to COVID-19 does in fact constitute an "Extraordinary and Compelling Reason" for a sentence reduction.**

Many federal judges across the country are holding that they have the authority to define "extraordinary and compelling reasons" for release under § 1B1.13 app. n. 1(D) and that the risks associated with COVID-19 can constitute an "extraordinary and compelling reason" for a sentence reduction. *United States v. Brooker (Zullo)*, No. 19-3218, 2020 WL 5739712 (2d Cir. Sept. 25, 2020). Courts have used their wise and appropriate discretion to provide defendants with relief under § 3582(c)(1)(A) "even when their circumstances do not fit squarely within the current policy statement of the Sentencing Commission as reflected in U.S.S.G. §1B1.13." *United States v. Alexander Salabrarria*, Crim. No. 7:00-CR-95-1-BO, ECF No. 125, page 5 (E.D.N.C. April 14, 2020), citing *United States v. Mauma*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *4 (D. Utah Feb. 18, 2020) (listing cases holding same).

In *United States v. Mel*, Judge Chuang held that "[a]s applied to Mel, the COVID-19 pandemic presents 'extraordinary and compelling reasons' that warrant the modest sentencing reduction requested." 2020 WL 2041674, at *2. Ms. Mel had submitted documents establishing that she had a thyroid mass that doctors estimated had a 25- to 40-percent chance of malignancy. While Judge Chuang found he could

10

not "conclude with certainty" that Mel had a health condition that placed her at particular risk to severe illness from COVID-19, he "nevertheless . . . f[ound] that the historic COVID-19 pandemic, the fact that Mel has been incarcerated in one of the federal prisons most profoundly impacted by COVID-19 [FCI Danbury], and the fact that as a result of the outbreak, she has effectively been prevented from receiving necessary medical care for a potentially life threatening condition, collectively establish 'extraordinary and compelling reasons' within the meaning of 18 U.S.C. § 3852(c)(1)(A)." *Id.* at 3.

Judges in districts throughout the United States have recognized that, at least for certain defendants, COVID-19 presents "extraordinary and compelling reasons" warranting a reduction in their sentences under the compassionate release statute. They vary from individual to individual, which is to be expected, but a common thread attaches them all; that is, the need to otherwise have a fighting chance at surviving alongside the necessary love family, as opposed to physically suffering and unnecessarily deteriorating once the coronavirus is contracted by an inmate because of his or her unfortunate medical diseases and concerns or simply due to the fact that COVID-19 is running rampant across our federal prison system leading to unnecessary suffering and death amongst the inmates therein. Some of these cases are cited below to identify the range of which Federal Courts across the country are granting such Compassionate Release Requests. These cases include, but are not limited to:

11

- *United States v. Howard*, No. 4:15-cr-00018-BR, 2020 WL 2200855 (E.D.N.C. May 6, 2020) (finding 52-year-old with "chronic obstructive pulmonary disease ('COPD'), Type II diabetes, obesity, Stage 3 kidney disease, edema, open wounds on his legs, and a diaphragmatic hernia" demonstrated extraordinary and compelling circumstances due to COVID-19 even though his conditions neither constituted terminal illness nor prevented him from engaging in most of his daily activities without assistance);

- *United States v. Norris*, No. 7:19-cr-36-BO-2, 2020 WL 2110640 (E.D.N.C. Apr. 30, 2020) (finding defendant had demonstrated extraordinary and compelling circumstances for relief because he "suffers from various severe ailments," including a life-threatening disease, kidney failure requiring dialysis three times a week, and recurrent bouts of pneumonia, "that cumulatively make his continued confinement especially dangerous in light of COVID-19.")

- *United States v. Hansen*, No. 17-cr-50062, 2020 WL 2219068 (N.D. Ill. May 7, 2020) ("[T]he Court cannot discount the risk to Hansen if he contracts coronavirus, as reliable information places him in a higher-risk category. Specifically, the presentence report documents that he suffers from diabetes, hypertension, high cholesterol, kidney disease, and chronic obstructive pulmonary disease, all of which are confirmed risk factors for serious illness if one contracts coronavirus.")

- *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (shortening 60-month sentence after only 21 months because Amarrah's "Type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea, and asthma" put him a substantial risk should he contract COVID-19 even though facility had no reported cases);

- *Casey v. United States*, No. 4:18-cr-4, 2020 WL 2297184, at *3 (E.D. Va. May 6, 2020)("The Court finds that Petitioner has set forth extraordinary and compelling reasons to modify his sentence because of the great risk that COVID-19 poses to a person of his age with underlying health conditions.");

- *United States v. Quintero*, No. 08-cr-6007L, 2020 WL 2175171 (W.D.N.Y. May 6, 2020) (granting compassionate release to man who "suffers from diabetes, a compromised immune system, obesity, and hypertension," "which make him more susceptible than another to contract the virus.");

- *United States v. Reid*, No. 17-cr-00175-CRB-2, 2020 WL 2128855 (N.D. Cal. May 5, 2020) (granting compassionate release based on risks COVID-19 presents to individual with hypertension, high cholesterol, and Valley Fever, which causes lung infection and can result in acute pneumonia);

- *United States v. Pabon*, No. 17-165-1, 2020 WL 2112265, at *1 (D Mass. May 4, 2020) (holding that for the 54-year-old defendant who suffers from "diabetes, hypertension, hemophilia, atopic dermatitis, gastroesophageal reflux disease, peptic ulcer, and diverticulitis" "nothing could be more extraordinary and compelling than this pandemic");

- *United States v. Echevarria*, No. 3:17-cr-44 (MPS), 2020 WL 2113604 (D Conn. May 4, 2020) (finding 49-year-old with pre-existing respiratory condition—a history of bronchial asthma—combined with the increased risk of COVID-19 in prisons had demonstrated extraordinary and compelling reasons for relief);

- *United States v. Early*, No. 09 CR 282, 2020 WL 2112371, at *2 (N.D. Ill. May 4, 2020) ("the Court cannot discount the risk to Mr. Early if he contracts coronavirus, as reliable information places him in a higher-risk category [62, diabetes and hypertension]. This, in the Court's view, qualifies as an extraordinary reason warranting consideration of a reduction of Mr. Early's sentence.");

- *United States v. Soto*, No. 1:18-cr-10086-IT, 2020 WL 2104787 (D. Mass. May 1, 2020) (finding inmate with hypertension at facility with COVID-19 cases located in New York had shown extraordinary and compelling reasons for relief);

- *United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241, at *7 (S.D. Miss. May 1, 2020) (granting compassionate release to young man without health issues at Oakdale I because "it has become increasingly apparent that the BOP has failed to control the outbreak at Oakdale I. … Given the steadily growing death toll and the apparent continued spread of the disease at Oakdale I, COVID-19 creates an 'extraordinary and compelling reason' potentially warranting a reduced sentence.");

- *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 10, 2020) ("Mr. Rodriguez's circumstances—particularly the outbreak of COVID-19 and his underlying medical conditions that place him at a high risk should he contract the disease—present 'extraordinary and compelling reasons' to reduce his sentence."); and

- *United States v. Miller*, No. 16-cr-20222-1, 2020 WL 1814084, at *4 (E.D. Mich. Apr. 9, 2020) ("Miller squarely fits the definition of an individual who has a higher risk of falling severely ill from COVID-19. . . . Therefore, the Court finds that extraordinary and compelling reasons exist for his immediate compassionate release.").

There is no question that Section 603(b) of the First Step Act fundamentally changed the role of courts in the compassionate release process, vesting them with the authority to determine what constitutes extraordinary and compelling reasons for release. This pandemic, as applied to Mr. Carlton with his current chronic illnesses and high risk for death once contracting COVID-19, is an extraordinary and compelling circumstance.

## B. Mr. Carlton's Dire Situation Presents an "Extraordinary and Compelling" Reason Warranting a Reduction in Sentence.

The Centers for Disease Control have identified several factors that put individuals at higher risk for severe illness. "People of any age with certain underlying medical conditions are at increased risk for severe illness from COVID-19." CDC, *People with Certain Medical Conditions.* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed October 12, 2020) (listing Type 2 diabetes mellitus, heart conditions, and obesity as medical conditions putting adults of any age at increased risk of severe illness from COVID-19).

While the Bureau of Prisons has made efforts to reduce the spread of the virus throughout the federal prison system, the rate of infection is far higher within the Bureau of Prisons than within the community at large, and continues to spread at an alarming rate, as the charts below demonstrate.

14



Amid this rapidly-unfolding crisis, the recommended antidote is simple: reduce the prison population by releasing those whose continued incarceration is not necessary to protect the public so that correctional institutions can better protect

15

those who need to stay incarcerated.[1]  Mr. Carlton is exactly the type of individual deserving of compassionate release: he is at risk of severe illness and, as will be discussed in the next section, his release does not pose a danger to the community and balancing the 3553(a) factors warrants the requested relief.

### C. The Relevant § 3553(a) Sentencing Factors Warrant Reducing Mr. Carlton's Sentence to Time Served / Adding a Period of Home Confinement as a Condition of Supervised Release.

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, Mr. Carlton's compromised physical health, and the unique once he contracts COVID-19, when combined with the other Section 3553(a) sentencing factors, warrant immediate relief.

The court shall impose a sentence that is sufficient but "not greater than necessary" to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

---

[1]  For example, on March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly and medically vulnerable inmates who have already served a majority of their sentence. *See https://fairandjustprosecution.org/wp-content/uploads/2020/03/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf.*  The same day, dozens of public health experts made a similar request, asking the President to commute the sentences of elderly inmates, noting they are at the highest risk of dying from the disease and pose the smallest risks to public safety. *See https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf.*

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. § 3553(a)(2)(A)-(D). "[A]lthough defendant's federal sentence may have been appropriate at the time it was imposed, the Court's analysis is different in current circumstances. *United States v. Lee*, 2020 WL 3422772, at *5 (E.D. Va. June 22, 2020). *United States v. Mel*, 2020 WL 2041674 at *3 (D. Md. Apr. 28, 2020) (finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.").

Any further detention of Mr. Carlton during this time would be to continue a sentence that is greater than necessary, particularly when "prisons now are even more dangerous than we typically accept." *United States v. Brown,* No. 4:05-CR-00227-1, 2020 WL 2091802, at *2 (S.D. Iowa Apr. 29, 2020). Mr. Carlton has served approximately half of his sentence which reflects the seriousness of the offense, but which takes into account that his offenses were non-violent and related to a lack of support and financial opportunities. Further deterring any future criminal conduct, Mr. Carlton has a clear release plan and will be residing with his older brother, Termonja Carlton. *See* **Exhibit D**, personal declarations of family members. Mr. Carlton's brother owns his home with his wife and has a bedroom waiting for Mr. Carlton, along with a vehicle for Mr. Carlton, and full-time light duty or modified employment. Termonja Carlton would also be assisting Petera Carlton in applying for disability due to his advanced physical deterioration from diabetes mellitus with

neuropathy which has led to multiple amputations and which will no doubt lead to future amputations. *See* **Exhibit D**.

To provide Mr. Carlton most effectively with medical care, he should be allowed to seek medical care outside of the BOP. Since Mr. Carlton has been detained, his health has declined dramatically. Mr. Carlton reported in an email on October 13, 2020, that approximately one week ago his leg started swelling due to a bacterial infection and he is being treated with intravenous antibiotics. *See* **Exhibit E**, Mr. Carlton October 13, 2020 email ("I've developed puss all over my lower leg and from the looks it's extremely infected. It caused fluid to get into my lungs and I was given a breathing machine a few days ago. The infection came from the showers not being cleaned enough.") Not only is his condition not improving while under BOP care, but his current severe bacterial infection was caused by a lack of sanitation and care at the BOP. Amputations are extremely common in Mr. Carlton's family, so it is likely that he would require amputation of all or part of his infected leg. *See* **Exhibit D** ("On his father's side of the family a lot of family members have had diabetes and died. One of his aunts had both legs amputated because of diabetes.")

Furthermore, Mr. Carlton's family circumstances have changed since his sentencing. His daughter, Arianna Perry, who was six months old at the time of sentencing, now resides with her biological mother, Antoinette Perry in Durham, North Carolina. According to Termonja Carlton, Arianna is not receiving the proper care or guidance from her biological mother. Termonja Carlton has tried to build a relationship with Arianna and Antoinette throughout the years, for example by

offering to provide clothes and school supplies for Arianna. Antoinette has other minor children to care for at this time and from conversations between Termonja and Arianna, it was clear to him that she was having to grow up too fast in that household. *See* **Exhibit D** ("Ariana is Petera's number one priority when he gets out. He wants to be a major part of her life because he doesn't like the way some things are going with her right now."). Mr. Carlton's focus after his release is to ensure that Ariana is on track to attend college and have the best opportunities for her future.

A reduction or modification of Mr. Carlton's sentence would not diminish the seriousness of the offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—compounded by the heightened risks faced by Mr. Carlton, whose ability to engage in basic self-protective measures is restricted and thus, warrant relief.

Mr. Carlton's period of supervised release awaiting him will ensure that he complies with the release plan discussed with his family. *See United States v. Early*, 2020 WL 2112371, at *5 (N.D. Ill. May 4, 2020) (finding that the risk to the public "does not outweigh the risk to [Early] from contracting the coronavirus while incarcerated," particularly where "the Probation Office and the Court will be monitoring him while on supervised release and []the Court will not hesitate to recommit him to prison should he again go astray.") The Court may also impose home confinement for a term equivalent to the remainder of his custodial sentence as well. 18 U.S.C § 3582(C)(1)(A). *See also United States v. Raia*, No. 2:18-CR-657, Dkt. No. 91 (D.N.J., May 7, 2020). Considering all of these emergency circumstances, the Court

could find a combination of supervised release and/or home confinement which would be sufficient to ensure deterrence, protection of the public, and which would allow Mr. Carlton to seek alternative medical care in a place that is sanitary and conducive to the recovery of his health before contracting COVID-19.

## CONCLUSION

Mr. Carlton has demonstrated extraordinary and compelling reasons for compassionate release and respectfully requests this Honorable Court to reduce his sentence to time served and/or add a period of home confinement as a condition of supervised release.

Respectfully submitted, this the 2nd day of November 2020.

GUIRGUIS LAW, PA

/s/ Nardine Mary Guirguis
Nardine Mary Guirguis
PANEL Attorney
434 Fayetteville St., Suite 2140
Raleigh, North Carolina 27601
Telephone: (919) 832-0500
Facsimile: (919) 246-9500
nardine@guirguislaw.com

*Designation: CJA Appointed*

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the Assistant

Attorney for the United States electronically at the following address:

        William M. Gilmore
        Assistant United States Attorney
        William.gilmore@usdoj.gov
        150 Fayetteville Street, Suite 2100
        Raleigh, North Carolina 27601

This 2nd day of November 2020.

        GUIRGUIS LAW, PA

        /s/ Nardine Mary Guirguis
        Nardine Mary Guirguis
        PANEL Attorney